Howard McDaniel, Appellant, v. William Kerr and Boss Hotel Company, a Corporation, Respondents, No. 43094.—258 S. W. (2d) 629.

Court en Banc, June 8, 1953.

Clay C. Rogers, Lyman Field and Rogers, Field & Gentry for appellant; Cross & Cross and Forrest M. Hemker of counsel.

*John H. Lashly* and *Lashly, Lashly & Miller* for respondents.

4

*Shughart & Thomson* for Zurich General Accident & Liability Insurance Company, Ltd., Continental Casualty Company, Indemnity Insurance Company of North America and United National Indemnity Company; *Popham, Thompson, Popham, Mandell & Trusty* for Standard Accident Insurance Company, Commercial Standard Insurance Company, Employers Reinsurance Corporation and Truck Insurance Exchange, amici curiae.

DALTON, J.—Action for $100,000 damages for personal injuries and disease alleged to have been sustained on account of defendants' negligence. Verdict and judgment were for plaintiff for $20,000, but the court, on motion, set aside the verdict and judgment and entered judgment for defendants in accordance with defendants' motion for a directed verdict. Plaintiff has appealed.

In his petition, plaintiff alleged that he was employed by defendant, Boss Hotel Company, under the direction of defendant William Kerr,

to knock off and remove old plaster composed of noxious, poisonous and harmful substances, to wit, sand, lime and silica; and that the removal of said plaster created great quantities of harmful and irritating dust composed of said substances, which plaintiff was required to and did breathe and inhale in large quantities, and which caused illnesses and diseases of his respiratory system, to wit, a lung abscess requiring the removal of his right lung. Plaintiff made numerous assignments of negligence based upon violation of common law and statutory duties.

The defenses pleaded by defendants included contributory negligence, assumption of risk and the court's lack of jurisdiction over the subject matter of said action for the reason that the defendants' liability, if any, for plaintiff's injuries was limited to compensation provided by the Workmen's Compensation Law of the State of Missouri. The affirmative defenses were denied by the reply. In view of the issues presented on appeal, we shall review the evidence favorable to plaintiff and to the verdict of the jury and disregard defendants' evidence unless it aids the plaintiff's case.

On or about April 1, 1946, the Boss Hotel Company acquired the Royal Hotel in Excelsior Springs, Missouri. The hotel was classified as a 150 room health resort hotel of brick construction. There were five floors on one side and four on the other. The old part of the hotel, which consisted of some sixty rooms, was badly run-down, the roof leaked and there had been much damage to plaster. A new roof was put on, new plumbing fixtures were installed, the rooms were replastered and redecorated where necessary and new furniture and new carpets were provided. After the roof was on, repair work was first started on the fourth floor and later continued on the third floor. Defendant Kerr, the hotel manager, supervised the work. Most of the plaster on the third floor and part on the fourth floor was loose and damaged and had to be removed. The plaster was removed by taking a hammer and pounding the walls and ceilings so as to break up the plaster and cause it to fall to the floor.

Plaintiff began working for the defendant hotel company about December 15, 1946. He was then in good health, 38 years of age, a common laborer, hard of hearing and a mouth breather on account of nasal obstructions. He was hired and put to work by Harry Kirk, the foreman in charge of the plastering. The tools furnished were a wrecking bar and a hatchet and he was directed to knock off old plaster. The foreman showed him where and how to proceed with the work and directed him not to hit too hard and not to break the laths to which the plaster was attached, if that could be avoided. When part of the plaster fell, plaintiff had to keep on beating the laths with the hammer to jar the plaster out of the spaces between the laths. There was much black dirt and dust on top of the ceiling plaster and, when the laths were hammered to jar the plaster out, the dust came down in plaintiff's face. As the plaster broke up and fell,

it created a heavy fog of dust that kept the room foggy. There was a fog of dust in the rooms all the time as the work progressed. Plaintiff had to breathe the dust, there was no way to get out of it and do the work. The air was laden with dust and the dust continued circling in the rooms. The work itself created such a dust that, when one went into the room, he could hardly see out of the windows. It was plaster dust and there was lime and sand in the plaster. The dust came from the plaster that was being removed and falling to the floor. Hammering off the old plaster created the dust and lots of it. The dust got on plaintiff's hands, hair, cap and clothing and in his ears. The plaster dust made his clothes as white as could be. Part of the time there was no ventilation in the rooms where the work was being done and the doors and windows were shut. As the plaster fell and the dust came up, plaintiff kept on working knocking off more plaster. Even when the windows were raised, it wouldn't take the dust out, as there was too much dust. When the broken plaster was down on the floor, plaintiff had to shovel it into plaster buckets and dump it down a chute to be hauled away.

Plaintiff had had no prior experience with this kind of work. He had no knowledge as to whether the dust would injure his health. He was not provided with a respirator or mask or anything to prevent him from inhaling the dust. He complained to his foreman, Harry Kirk, about the dust and the conditions under which he was required to work. He went to him two or three different times and told him he would like to have a respirator or "some way to keep the dust down." Kirk said that he would see what could be done, but afterwards, Kirk said that Kerr couldn't get any respirators, there weren't any in town. Kirk said that plaintiff didn't need a respirator anyway and to get along without it. Plaintiff "took him at his word" and had no respirator to use.

Certain admissions of defendant Kerr were offered and received in evidence, which tended to show that Kerr saw and knew where plaintiff was required to work, knew how plaintiff was required to remove the old plaster and knew plaintiff was required to breathe the plaster dust in the air. Other evidence tended to show that, after some of the rooms were finished, furnished and occupied by guests, Kerr closed the door to the particular room in which plaintiff was working and told plaintiff to keep the doors shut and keep the dust out of the halls. Plaintiff's foreman, Kirk, testified that plaintiff complained to him two or three times about the dust in the rooms, and said he would like to have something to keep him from inhaling the dust all the time. Another witness testified to hearing plaintiff ask for a mask. Still another testified to hearing plaintiff complain of the dust and ask Kirk to get him a respirator. Kirk reported the matter to Kerr, who said, "Never mind, he will get along without it anyhow," and that there

were no respirators in town. The same witness testified that after the hotel was renting rooms across the hall, Kerr ordered the doors closed to the rooms where plaintiff was knocking off plaster, so as to keep dust out of the halls and out of the rooms that were being rented to guests. When Kerr was advised by plaintiff that it was "pretty hard for a man to have that door closed," he replied, "Oh, that is allright. It has to be closed. People can't stand that dust." Kirk's testimony tended to show that he knew that plaintiff "ought to have a mask" and knew that plaintiff was "entitled to one" in "all that dust," but the witness did not see plaintiff wearing one and didnt know whether he got one.

There was evidence that the conditions under which plaintiff worked were similar to other repair jobs. It compared with "about the average of that type of work." Defendants' witness Griffing, a housing contractor, who worked as a carpenter on the job, knew there was heavy dust caused by the plaster being torn down. He said: "You ran into the same conditions in all types of repair work as far as dirt and dust is concerned." The witness further testified: "Q. So it is equally true that it's recognized by you and others in construction work that where there is dust coming from sand and plaster and dirt of all kinds that that dust may be injurious to the workmen and particularly inexperienced workmen, and for that reason they provide a standard respirator; isn't that the truth of the matter? A. Yes, sir: Q. That's what I thought it was. And that condition, that danger, that hazard, was recognized in the construction industry long before you ever went to work for the Royal Hotel, wasn't it? A. Yes, sir. That mask has been on the market for a long time."

Defendant Kerr testified that Mr. Griffing, who was not removing plaster, came to him and said he wanted a respirator and Kerr told him to get one and then reimbursed him for the expense. The respirator was paid for on the theory that, perhaps, it was necessary equipment for a man working in the dust. Defendant Kerr directed Kirk and Kirk directed plaintiff in removing the plaster.

Plaintiff had no lung damage before he started working on the job in the dust. He had about six months work in knocking off plaster, "in the heaviest," for about six and one-half to seven hours per day. Within two or three months after starting to work in the dust he developed a cough, and started coughing. As time went along the cough got worse. When plaintiff would go home, after working in the plaster dust, he would find a cloudy deposit in his mouth and his nose would be stopped up. He continued knocking off plaster and, later, doing patch plastering, until two or three weeks before he was finally laid off in December, 1947. At that time he had begun to have pains in his chest. The first severe attack of pain occurred in November, 1947, on Thanksgiving day. It was so severe he called a doctor, Dr.

8

Buehrer. The next attack occurred about December 15, right after he got off from work. He had shooting pains through his right side and again a doctor was called. Plaintiff was coughing and spitting up phlegm and chunks of dirt, phlegm with black streaks through it. About January 2, 1948, it was ascertained that he had an abscess in his right lung. He was put to bed with his head down to drain foul smelling pus out of his abscessed lung. During 1948, his condition got worse. On October 10, 1948, he went to the state hospital at Mt. Vernon, and in December, 1948, his right lung was removed.

Dr. Buehrer, his family physician, saw plaintiff several times between December, 1946, and December, 1947. Plaintiff came for nasal treatment because of the irritation of the dust that he was working in. The witness found that plaintiff's "tissues were markedly irritated"; there was "marked congestion of the tissues" and "there was some of the dust still on the mucus surface there." In December, 1947, when he learned that plaintiff was still working in a dusty place he told plaintiff "he should get out of the dust." In answer to a hypothetical question reviewing the facts shown by plaintiff's evidence, Dr. Buehrer gave it as his opinion that the inhalation by plaintiff of the dust created by the work he was doing directly caused the lung abscess and resulted in the removal of his right lung. The lime would cause a "gradual necrosis of the tissues" of the lung "and then, any intercurrent infection would cause a pneumanic process to develop around an area where there was a slight necrosis." The disease was the result of the occupation in which he was engaged.

There was testimony by medical experts to the effect that the lung abscess was directly due to the continued inhalation by plaintiff of the dust created by the work he was doing; and that the continued breathing and inhalation of dusts of various kinds and particularly sand and lime have an irritating effect upon lung tissues. Sand dust in the plaster would have an irritating effect on the lungs, but not so much as the lime. In answer to a hypothetical question, Dr. Pernoud gave it as his opinion that the inhalation of these dusts was the cause of plaintiff's lung abscess, since inhalation over a long period of time of lime dust and other dust created constant irritations within the lung, which in time picked up infection, and secondarily caused an abscess of his lung. His theory was "this inflammatory process denuded the mucus membranes; infection took place and abscess developed." There are well known and approved respirators which would have prevented inhalation of the dust.

Plaintiff's cause was submitted as a common law action for violation of the "nondelegable duty to exercise ordinary care to furnish him a reasonably safe place in which to work and reasonably safe equipment and appliances with which to work", and plaintiff's instruction No. 1, further, required a finding, in part, as follows:

"6. That the defendants knew or by exercise of ordinary care should have known that said work would necessarily directly produce such noxious harmful and irritating sand, silica, lime and plaster dust, if so, and knew or by exercise of ordinary care should have known that same was likely to and probably would cause injury to and lung damage and abscesses to plaintiff, if you find it would do so;

"7. That the plaintiff requested the defendants to furnish and provide him with a reasonably adequate respirator so as to reasonably, if so, prevent the inhalation by him of said dusts, if you find they existed as submitted herein, and that defendants negligently and carelessly, if so, refused, failed and neglected to so furnish and provide plaintiff with such a respirator and negligently and carelessly, if so, ordered and directed him to proceed with said work without such respirator and negligently and carelessly, if so, assured him that he could safely proceed to do such work without such respirator;

\* \* \* \* \* \*

"10. And if you further find that as a direct result of the negligence and carelessness of the defendants, if any, as submitted herein, the plaintiff did breathe noxious, harmful and irritating sand, silica, plaster and limedust in harmful quantities, while at his work mentioned in evidence for defendant, Boss Hotel Company, and that as a direct result thereof he suffered an abscess or abscesses of his right lung which directly required the removal thereof, if so;

"Then under such circumstances if you so find them, your verdict shall be in favor of plaintiff, Howard McDaniel, and against the defendants, William Kerr and Boss Hotel Company."

In entering judgment for defendants notwithstanding the verdict for plaintiff, the trial court held that the testimony on the part of both plaintiff and the defendants showed as a matter of law, that the plaintiff suffered an "accident" within the meaning of the Missouri Workmen's Compensation Act; that no occupational disease was shown by the evidence; that such a showing was necessary to *exclude* the applicability of Missouri Workmen's Compensation Act, which had been pleaded and proven; and that the circuit court had no jurisdiction of the cause.

Appellant contends that the court erred in setting aside the verdict and judgment for plaintiff and in entering judgment for defendants. Appellant's theory is that "the dust which caused plaintiff's damage resulted from a known, foreseen and expected condition arising from and caused by the work, and, therefore, was not an 'accident' within the meaning of the Workmen's Compensation Act"; that the damage and injury to plaintiff came into existence as a slow progressive condition with no apparent damage to the physical condition of his body and without any "objective symptoms of an injury"; and that it was only after he had been engaged in the work two or three months that

his cough originated and gradually grew worse. Appellant admits that if, under facts disclosed by the evidence in this case, plaintiff had "a right to proceed against his employer for Workmen's Compensation, it stands admitted that he would have no right to his action for damages." Appellant says the evidence shows that his condition was caused by the violation of defendants' common law duty to him; and that he has a clear right of recovery at common law.

Respondents, on the other hand, insist that "the disability claimed by plaintiff to have been sustained and caused by the inhalation of plaster dust was, and is, under the evidence and the decided cases, injury by 'accident' within the meaning of ▮ that term as used in the Workmen's Compensation Act." Respondents say that plaintiff's own evidence, by which he is bound, "shows that there was an abnormal and unusual condition created, which was not expected while plaintiff was knocking off the old plaster." Respondents refer to the closing of the doors after some of the rooms were finished and occupied and to respondents' alleged refusal to furnish a respirator. Neither of these matters caused the conditions complained of. Respondents further insist that "evidence, if any, tending to show that the injury to the plaintiff was a slowly progressive condition is not decisive of the issue as to whether plaintiff suffered an injury by 'accident' within the meaning of that term as used in the Workmen's Compensation Act."

▮ Whether or not the Workmen's Compensation Act, Chapter 29, R.S. 1939, as amended, and in force and effect between December 15, 1946 and December 19, 1947, was applicable to the facts of this case, was an affirmative defense and the burden of proof to establish that defense rested upon defendants. McKay v. Delico Meat Products Co., 351 Mo. 876, 174 S.W. (2d) 149, 155. But, if from a most favorable view of the whole evidence, including the solemn admissions by plaintiff of record, the facts admitted are such as a matter of law to bring plaintiff's right of action against the defendants for the injuries complained of within the provisions of the Workmen's Compensation Act, then and in that event plaintiff may not recover in this action at common law and the court did not err in setting aside the verdict and judgment and entering judgment for the defendants. It is well settled that the Workmen's Compensation Act is wholly substitutional in character and that any rights which the plaintiff might have had at common law have been supplanted and superseded by the Act, if applicable. McKay v. Delico Meat Products Co., supra.

▮ We must first determine whether a view of the evidence favorable to plaintiff shows as a matter of law that the damaged and diseased condition of plaintiff's lung, which plaintiff's evidence tended to show was caused by the inhalation of plaster dust, was

under the evidence and the decided cases caused by "accident" within the meaning of that term as used in the Workmen's Compensation Act, Chapter 29, R. S. 1939, Sec. 3695(b).

Section 3695(b) reads: "The word 'accident' as used in this chapter shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen *event* happening suddenly and violently, with or without human fault and producing at the time objective symptoms of an injury. The term 'injury' and 'personal injuries' shall mean only violence to the physical structure of the body and such disease or infection as naturally results therefrom. The said terms shall in no case except as hereinafter provided be construed to include occupational disease in any form nor shall they be construed to include any contagious or infectious disease contracted during the course of the employment * * *." (Italics ours). And see Sec. 287.020(2)(3) RSMo 1949. Section 3691 R. S. 1939 further provided for "compensation under the provisions of this chapter for personal injury or death of the employee by *accident* arising out of and in the course of his employment." (Italics ours). And see Sec. 287.120 RSMo 1949.

In the case of Joyce v. Luse-Stevenson, 346 Mo. 58, 139 S.W. (2d) 918, 920, in construing these statutory provisions in a case which had been instituted under the provisions of the Workmen's Compensation Act, this court pointed out that "The *event* which constitutes an *accident* is thus clearly a happening or occurrence in part at least *external to the body itself*. The physiological changes which may result in the workman's own body are consequences of the accidental event." (Italics ours). In that case the employee died of lobar pneumonia complicated by empyema and coronary embolism and it was contended that the evidence showed a causal connection between the exposure to dampness while at work and the disease which caused the employee's death. The court said: "But where, as here, the disease resulted from exposure in the ordinary course of the employee's work, the weight of authority is to the effect that the disease is not compensable." This court reached the conclusion that no accident was shown within the meaning of the Compensation Act. And see State ex rel. Hussman Ligonier v. Hughes, 348 Mo. 319, 153 S.W. (2d) 40, 42, where the court said: "Nor does the injury itself constitute the 'event' or 'accident' as held by the Court of Appeals. To so hold would make the Act provide for insurance against disease and injury rather than against accident."

The evidence in this case wholly fails to show an "accident" within the meaning of the Workmen's Compensation Act as previously construed by this court. The dust which filled the air plaintiff was required to breathe and the dust which irritated his

lungs and brought about the disease and injury of which he complains was not the result of any "accident" or any unexpected or unforeseen event happening suddenly and violently with or without human fault. The dust arose from the intentional and purposeful breaking up of the old plaster and the beating and vibration of the laths to clear them of the plaster and from the broken plaster as it fell to and broke upon the floor and the dust arose from removal of the plaster from the floor. The presence of the dust in the air was caused by the usual and normal progress of the work. The evidence wholly fails to show that its presence was due to any unusual, unforeseen or unexpected event arising suddenly and violently in the progress of the work. The presence of the dust in the air and its contact with plaintiff's body and lungs and the results there produced were not the result of an "accident" as that term is used in the Workmen's Compensation Act and the circuit court was not without jurisdiction of the cause in question by reason of the Workmen's Compensation Act. And see, Killian v. Sterling Aluminum Products Co. (Mo. App.), 227 S.W. (2d) 526, 531; Johnson v. Westinghouse Elec. & Mfg. Co. (Mo. App.), 192 S.W. (2d) 588, 595; Gillett v. Prairie Brass & Metal Co. (Mo. App.), 179 S.W. (2d) 494; Becherer v. Curtiss-Wright Corp. (Mo. App.), 194 S.W. (2d) 740; Kerby v. Mo. State Highway Comm. (Mo. App.), 238 S.W. (2d) 464.

Respondents rely upon Tindall v. Marshall's U.S. Auto Supply, 348 Mo. 1189, 159 S.W. (2d) 302; McKay v. Delico Meat Products Co., supra; Rue v. Eagle-Picher Lead Co., 225 Mo. App. 408, 38 S.W. (2d) 487 and numerous cases from foreign jurisdictions. The latter cases are not particularly beneficial because of differences in statutory provisions. The Missouri cases cited are, in our opinion, easily distinguishable upon their own peculiar facts.

Respondents, however, further contend that "even if plaintiff's condition was not the result of an 'accident', within the meaning of the Workmen's Compensation Acts, plaintiff failed to make a submissible case for the further reason that there is no evidence showing that the condition of which plaintiff complains was peculiar or incident to the work in which plaintiff was engaged" or that "other persons engaged in removing plaster and inhaling plaster dust have suffered a similar disabling condition and that such condition is an incident to and ordinarily follows that type of work." Respondents' position is that, if an employee suffers injury or damage, which is *neither* the result of an "accident" nor is an "occupational disease", he has *no* right to proceed against his master for common law negligence. The trial court's ruling appears to have been based upon the same theory, to wit, that plaintiff's rights were limited to recovery under the "occupational disease statutes" or under the Workmen's Com-

pensation Law; and that, if no "occupational disease" was shown, there could be no recovery at common law for violation of common law duties. Respondents rely upon Wolf v. Mallinckrodt Chemical Works, 336 Mo. 746, 81 S.W. (2d) 323; Downey v. Kansas City Gas Co., 338 Mo. 803, 92 S.W. (2d) 580, l. c. 584-585. These cases do not support respondents' position. The Wolf case was an action by an employee against his employer for injuries to health caused by contracting an "occupational disease." Apparently it was submitted solely on negligence by reason of the violation [636] of the specific occupational disease statutes and it was held that the evidence was insufficient to make an issue for the jury that combined sclerosis, constituting a degenerative process of the spinal cord, sustained by an employee engaged in the manufacture of zinc and aluminum stearate, was peculiar and incident to plaintiff's work and, therefore, an "*occupational disease.*" In ruling the case the court reviewed the "testimony given by plaintiff tending to prove violation of the occupational disease statutes" and the court said: " * * * there was no evidence that the disease which plaintiff contracted was peculiar or incident to the work or process carried on. Such evidence is essential to the proof of an *occupational disease* not only under the common law, but under compensation statutes, which sanction awards for illness, and also under statutes which, as in Missouri and Illinois, afford a remedy independent of the compensation statute. At common law an employee had no right of action against an employer for damages arising from disease contracted in the course of his employment as an incident thereto *in the absence of a showing of negligence* on the part of the employer." (Italics ours). 81 S.W. (2d) 323, 327.

The Downey case, 92 S.W. (2d) 580, was ruled on the theory that plaintiff's action was one to recover damages for "an occupational disease," (92 S.W. (2d) 580 and 584), but the evidence showed injury by "accident." The court said that the Wolf case was authority for holding that the plaintiff's trouble was "not an occupational disease", and held that plaintiff's evidence justified a finding that "he suffered an injury compensable under the Workmen's Compensation Act" so that he was not entitled to recover damages in an action at law.

The plaintiff's cause was not submitted as an action to recover for "an occupational disease", nor on negligence by reason of the violation of the occupational disease statutes, now Secs. 292.300 et seq. RSMo 1949. It was therefore wholly immaterial that an "occupational disease", that is, an "illness or disease peculiar to the work or process carried on" was not shown by the evidence, or whether such was shown, provided the facts shown excluded "accident" and coverage under the provisions of the Missouri Workmen's Compensation Act; and that negligence, causation and injury and, therefore, common law liability for violation of common law duties, was shown by the evidence and the cause was properly submitted on such basis.

Except as above stated, to wit, that the evidence showed "accident" as a matter of law and that no "occupational disease" was shown, there is no contention by respondents that the evidence was not entirely sufficient to sustain the verdict upon the theory of liability upon which the cause was tried and submitted to the jury. On the record presented, we hold that the court erred in setting aside the verdict and judgment and in entering judgment for defendants. See Row v. Cape Girardeau Foundry Co. (Mo. App.), 141 S.W. (2d) 113.

The judgment is reversed and the cause remanded with directions to the trial court to reinstate the verdict of the jury and the judgment rendered in accordance therewith.

*Ellison, Hollingsworth* and *Leedy, JJ.,* and *Conkling, C.J.,* concur; *Hyde* and *Tipton, JJ.,* not sitting.